Securities, Mr. Schwartz. May it please the Court, good morning. This is an appeal from a summary judgment by Judge Hughes in Houston. And the summary judgment was wrong because Judge Hughes weighed the facts and made a decision as if the matter had been presented to him for a bench trial. But we were in a summary judgment proceeding. He mistakenly concluded that J.P. Morgan owed no fiduciary duty to Mr. Civelli and his company Astor Capital, which I'll refer to just as Civelli, if I may, for convenience, by weighing the evidence. I mean, does that all rely on whether there was a so-called special account that was created? Sir? Does that all, as to the fiduciary duty, does that all rely on whether there was a so-called special account created? It relies on whether it's a special account as well as whether there was a trust relationship created by virtue of the bank's knowledge, J.P. Morgan's knowledge, of the purpose of the stock in the account. So Judge Hughes got it right on the law. He recognized that the financial institution could be held responsible if there was a special account, that is, a special deposit, or if the financial institution had knowledge that the assets in the account were being held for somebody else. But then he decided that matter, and in doing so, he disregarded or took his own interpretation of the evidence with respect to that account. So, for example, the account was opened with a letter of authorization from Mr. Bill Molisek, who was basically Mr. Civelli's business partner for many years. And the letter of authorization provided that shares of stock were to be transferred from a pie group, which was a Molisek company account, to another pie group account with this key notation in handwriting in the letter of authorization, CO, aster, capital, S, A, the specific company that is Mr. Civelli's. So the directive in the opening of the account— What's your best case for the proposition that CO somehow creates something that wasn't otherwise there? Yes. It is a creation of the account for aster, or care of aster. And this is further evidenced by an email from the account executive— No, no. I'm saying what is your best case, your best, like, citation. Oh, I'm sorry. I misunderstood. Case. Yes. What's your best citation for the proposition that putting the phrase C-slash-O, which we see in letters all the time, which just means we're sending it to someone at someone else's house, means that that creates something that wasn't there to begin with? I think Your Honor could look at the Aduay case from 1910, which was a certificate of deposit, which said, Mr. Compton, guardian. There's another certificate of deposit case, Hodge, where it was Mary Hodge as next friend. It's a similar concept that the shares are being held for aster. And the account executive, Mr. Ron, wrote an email in August of 2013, where Mr. Molisek was looking at selling shares and asking questions about his accounts. And Mr. Ron wrote to Mr. Molisek and said, the account you're asking about is the special account for aster. The special account for aster. And Judge Hughes determined that those words were meaningless. He acknowledged that there were evidence in the record that the account was C-O aster or for aster, but he decided those things didn't have any meaning and accepted J.P. Words meant a nickname. But even in the Aduay case, the court rejected the idea that it could just be a nickname. And so here we presented evidence that when the account was opened, it was an opened care of Aster Capital S.A. the company, that the bank had internal documents where the title of the account, which indicates ownership, was at the pie group number three aster account, that Mr. Ron wrote the email, that there were bank statements which included the title number three aster. And as Judge Haynes, as you pointed out, context is important. And the context here was that these shares were shares which had been replaced in connection with the loan transaction that Mr. Ciavelli had made with Mr. Molisek. And Mr. Dale Dawsey was the lawyer for Mr. Molisek and Mr. Ciavelli. And Mr. Dawsey had notes and schedules which showed that the exact number of shares in the account were, at Chase, due aster. And so the shares were being held for aster. Even Mr. Molisek admitted in his deposition that the shares in the account were being held for somebody else. He wouldn't agree with me who it was, so we got to the point where he said it's either for the beneficiaries who he was representing or for aster. So all these circumstances taken together show that J.P. Morgan knew that the shares in the account were for aster and that it was a special deposit, which is the special account. So your contention, as I understand it, is that the J.P. Morgan defendants had a meeting of the mind to conspire with Molisek to steal these plaintiffs' funds. Is that right? It's actually a little different, Your Honor. So they had a meeting of the minds to transfer the shares out of the account knowing that the shares were for aster. And so they committed an act in furtherance to the conspiracy to commit the theft. So they facilitated the theft that Mr. Molisek undertook. I assume, even though that's not what this case is, that that would be some kind of a criminal violation under state or federal law, would it not? Should be, yes, sir. So and that gets us to the statute of limitations argument, because Judge Hughes decided that the conspiracy and negligence claims were barred by the two-year statute of limitations. And in doing that, he made two mistakes, one of which was that he decided that the injury to Mr. Ciavelli occurred when J.P. Morgan made the transfer. But the shares had been on loan to Mr. Molisek. It was a demand loan. And when Mr. Ciavelli learned that the shares had been transferred, he made an inquiry. So he certainly put on notice that something had happened. So he did what he was supposed to do. He made inquiry to who? Dale Dawsey, the lawyer, a fiduciary, and to Phil Molisek, a trustee, another fiduciary, and said, what's the deal with my shares? And was assured that the shares had been moved to another account, but were being held for him, for Aster. And so at that time, then, the wrongful act that J.P. Morgan committed was the transfer. But the damage had not yet occurred. The tort had not been completed, because as far as Ciavelli knew, the shares had gone from one safekeeping to another. So Ciavelli's damages only came about later, when he demanded the shares, and Mr. Molisek refused to give them back. That's when the tort was completed. The damage to Mr. Ciavelli was contingent upon something else happening. The transfer alone was not enough. And so the court made a mistake in finding the transfer was the time of the injury to Mr. Ciavelli. The other mistake the court made had to do with determining that no fact issue existed with respect to the investigation that Mr. Ciavelli did. And so the court decided, and you see it in the opinion, that Mr. Ciavelli's investigation was inadequate. The issue was under the discovery rule. So everybody agreed the discovery rule applied. J.P. Morgan applied the rule to argue that the statute of limitations began to run in February of 2014, as opposed to the time of the transfer in December of 2013. Judge Hughes did a discovery rule analysis, where he looked at what he called Ciavelli's excuses, and he said Ciavelli's excuses were inadequate. The only way that he could get to that conclusion was to weigh the evidence, which is what he did. Because what the evidence showed was that when Mr. Ciavelli learned about the transfer, that he asked Mr. Dawsey and received assurances. He asked Mr. Molisek and received assurances, and then he continued to receive assurances. Okay, but even if he got assurances, why can't a district court conclude that as a matter of law, those assurances don't matter? Why is that a fact issue? So there is a Texas Court of Appeals case, it's an M&M case. And in that case, a client relied upon a lawyer to handle their property. And the client learned that the property had been sold, and they had not received any money. So the client asked the lawyer, what's the deal? Our property's sold, you haven't given us any money. And the lawyer told the client, assured the client, that your funds are invested in another  When we sell this property . . . Yeah, but that's a lawyer who is their fiduciary. And Mr. Dawsey was the fiduciary, too. Mr. Dawsey was Mr. Ciavelli's lawyer. Mr. Dawsey handled the initial transaction in 2009, when the shares were loaned in the first instance. Mr. Dawsey held shares in an account of his own, CO Aster, and I want to come back to that, if I could. So he was Mr. Ciavelli's attorney. And so Mr. Ciavelli ought to be able to depend upon an assurance from his lawyer that the shares are still being held. Okay, but I thought this was with the fight with Molisek. I mean, this is a little different arena, isn't it? But it overlaps. So we have claims against Mr. Molisek, Mr. Ciavelli does, for numerous things, including theft of the shares, including the failure to pay the loan, including the failure to pay other loans and things in this 14-year relationship that these two people had. But the assurances came from Mr. Dawsey. They also came from Mr. Molisek, who . . . Yeah, I thought that was the key. I think it's . . . Came from Molisek. Yeah, I mean, he . . . So, I mean, if my lawyer lied to me because someone else lied to my lawyer, that's a little different than if my lawyer's the one stealing my money. The lawyer wasn't stealing the money. The lawyer didn't ever believe that the shares had been transferred improperly. Okay, but what I'm saying is that this is not the same thing as the lawyer taking the money and then lying to their client. That's a different world. I agree. Because that's why I was misunderstanding your argument. Okay. I agree with you, Your Honor. The reason I was raising that case is because in that case, under the discovery rule, the court said the clients were under a duty to investigate, and they did investigate. They had assurances from their lawyer. I don't think there's a distinction here. But here, they didn't investigate with JP. Well, Mr. Civelli didn't have an account with JP Morgan. I mean, he's claiming JP Morgan owes him all these duties, but he doesn't have any ability to talk to him. That just seems a little bit inconsistent, doesn't it? Not to me. Because you look at all the cases going back to 1910, where the courts have imposed a trust relationship. They don't have the trust relationship with the party who is asserting it. The Grieve case involved somebody who said that the community property from the father's estate was half that person's. They had no relationship with the bank, but the bank knew that it was holding community property and transferred the money anyway. And the court said, that's wrong. In the case of the Hodge case, where the minor sought to recover funds that the mother had taken from cashing a certificate of deposit following a settlement, the bank didn't have a relationship with the minor. The minor sued when he reached minority many years later. So that relationship with Civelli is not the controlling fact. The controlling fact is that JP Morgan knew. The evidence shows that JP Morgan knew of the trust nature of the deposit. And so what we're complaining about is, a jury might disagree with this. The judge obviously disagreed with this, but there was sufficient evidence for the matter to go to a jury. And Judge Hughes incorrectly decided a contested fact issue. I'll reserve the rest of my time. Yes, you've taken time for your brother, Mr. Schwartz. Thank you. Mr. Dove? Good morning. Good morning. May it please the court, I'm Chris Dove on behalf of the brokerage. In their briefs and here this morning, there have been two rules that have prevented Civelli from making a valid claim against the brokerage, which was just a brokerage that obeyed its customer's instructions. And those two problems are these. First, Civelli yearns to talk about his dispute with Mulachek. He wants to talk about what Mulachek said to Mulachek's lawyer. He wants to talk about what went on over here or what Mr. Mulachek had agreed to do years before. This claim is against the brokerage for the brokerage's duties, if any, based on the brokerage's actions. Civelli knew what the brokerage did in February 2014. We know that because he said so plainly in writing and then confirmed it in his deposition and his declaration. We also know that the brokerage owes no duty to a third party like Civelli, who is not its customer, because it never agreed to change its entire business model to hold shares on behalf of a stranger. The second problem with this case is that Civelli cannot resort to FINRA regulations to fill in the duty he cannot state under Texas law, which is what he tries to do in his reply brief. Mr. Schwartz a couple of times referred to some older cases, a 1910 case and another one. Could you address those for us? Gladly. So when you look at the body of law that affects this duty, you're going to see they rely on three very old cases, Ottoman Lobet, Grebe, and Hodge. What happened in those cases was it was established that the bank knew and agreed to a status where it was holding funds in trust for a third party. I know that you were holding them for a third party. I have agreed to do that and to participate in that process. And if you look at the Attaway and Lobet case, I think that's the one where the Texas Supreme Court lays out its 1911 view of how the law works. There was some evidence that you agreed to act in this capacity, but it says there is another rule that a bank never has to intrude on what its customer does with its money. But in that case, they said, you can't rely on that rule, bank, because you took the funds for yourself. You took those funds that you believe to be held in trust and used them to discharge a debt to your own bank. That's the same thing that happened in Hodge, the same thing that happened in Grebe. In all of those fact patterns, it makes sense that the court would come back and say, if you had agreed to do that and then you participated, you personally benefited from it, all of the facts are here. You had to express agreement and you had the action in violation of that agreement. There's no way you can claim you didn't know what was going on when you personally profited from the act. That's absolutely not what happened here. When you look at the cases we think state the standard much more recently than the turn of the last century, when you look at cases like Citizens National Bank v. Hill, when you look at cases Citizens National Bank v. Cinco, the South Central Livestock case, all of these are the Texas Supreme Court in the 70s explaining what this law is and it works this way. There must be an express agreement for a bank to act as the fiduciary on behalf of a third party. It must be express. The fiduciary cannot have that foisted on them or implied onto them. They must agree to do it. We've pointed out in our brief that these cases are all bank cases and that you need to keep in mind that we are a brokerage. This is particularly important because, as we brief in this case, as a brokerage who opened a margin account on behalf of one of our existing customers, that customer swore he owned the shares and nobody else, that he was pledging the shares to us for us to and that we said inexpressly, we are not your fiduciary. That is what they have to erase from the record, but it provides the necessary context for everything that follows. That was the contract. You know, it's funny, as we were sitting here listening to the last case, and I almost hesitate to talk about it because I haven't studied the briefs in the last case, there was talk about, well, these words and what do they mean? And I kept thinking, but those are in the context of a contract. In this case, the contract is absolutely clear. It is resoundingly against what Chiavelli is trying to argue, and that is exactly what the district judge noted in this case. When you look at this record, what you have is an institution that does not, under any circumstances, accept this sort of deposit. I have given you power. Your opponent keeps arguing that the district court made fact findings, but even if the district court made fact findings, if ultimately, assuming the facts in favor of the plaintiff, the plaintiff still loses, then we can still affirm the summary judgment. So, I mean, in other words, even if the district court made mistakes, if the district court made an ultimately correct decision, then we can still affirm. I agree with that wholeheartedly. I don't necessarily want to concede that the judge actually made fact findings. Oh, I'm not saying he did or didn't. I'm just saying even assuming arguendo, that some fact findings were made that shouldn't have been made, it doesn't change that if there's no evidence to support an alternate fact or the law is correct as determined, then we still can affirm. Yes, I agree. And I think what the judge did was entirely appropriate under the circumstances. I understand why they want to characterize it as fact finding, because it did not go well for them, but what the judge said was, I can read Texas law, and the Texas law says you have to have an express agreement. Where's your evidence? Show me your evidence of an express agreement, and they said, well, you have to let us please have some more discovery on that. Does the state law require that the word fiduciary be used? I don't believe that it does, not the specific word fiduciary. I believe you could create one of these things by saying, for instance, I want you to hold this in trust for so and so, or I want you to hold this for the benefit of so and so. I don't think the word fiduciary is magic. I think that what matters in this case is we swore that absolutely not never would we hold shares for those circumstances, and then when it comes time to ask, well, where is your evidence of this express agreement? They don't have anything like that. What you've heard this morning is Mr. Schwartz talking about some evidence, for instance, what Mr. Dossi had said, and I kept noting, first of all, he's talking about communications that the brokerage never saw, never heard. This wasn't any part of their business with their client. Secondly, he's talking about, literally, the guess made by Mr. Dossi's son about what his son probably thought, but I never talked with him about the subject. The record makes that absolutely clear. That is the basis of that argument, and it's irrelevant because JPMorgan Chase never heard it in the first place. When you get down to the absolute nitty-gritty, as we pointed out in our brief, their case can only rest on five documents. It can't rest on any testimony about the documents. They deposed everybody who touched them. Everybody gave testimony inconsistent with their position, inconsistent with ours, but I understand it's the summary judgment standard. We have to take things in their favor. All they've got is these five pieces of paper, and when you apply those papers to the standard that's created in Texas law, it doesn't meet. What I would urge this court to review, again, is Citizens National Bank v. Hill, 1974. This court has also issued two very similar opinions of its own, Rivaldo and Goodson Steele, but if you look at Citizens National Bank v. Hill, it's just as clear as it could be. The name of that account was the so-and-so trust account, and the argument was, well, you knew it said trust account. You must have been holding it in trust for a third party. Texas Supreme Court said, absolutely not. When you put that name on there, all that tells the bank is that you, the depositor, are a trustee acting as a trustee. It's a very different question as to whether the financial institution has agreed to intrude in the trustee's business, to take on the duties of a trustee itself. The same is true here. When you look at these documents, what you see is care of Aster. Your argument is my being a trustee doesn't make you one. That's exactly right, and the law expressly says so. What you have is references. None of these are contracts. They're communications. They're not, in some circumstances, even seen by JPMorgan Chase. What you see is care of Aster, or number three Aster. The record shows parties are entitled to use a descriptive name. It's not the name of the account. It's unequivocal that the name of the account has to be the name of the depositor, which was Pi Group LLC. But after that, for your own convenience, you can distinguish things. Here, Mr. Mluczek had three margin accounts. He personally journaled them as number one, number two, number three Aster, so that he could keep track of them. This is no different than what my teenage son just asked me to do. He said, will you please help me open a bank account? I want to buy a car, and I've got $50. And I said, bless you for your ambitions. We will help you do that. That does not make the bank a trustee on behalf of the company he's going to buy the car from. The same principles are applied here. And as you noted earlier, Judge Haynes, it's particularly strange that they're hanging so much weight on a label that, indisputably in the record, is a label that the depositor or the customer can use. Care of Aster. I don't know what care of Aster is supposed to mean. As you had said, normally it means I send it to person A via person B. It's opposite. It's reversed from the normal circumstance. I don't particularly care. I mean, by mail, it definitely, like when my dad has now passed away, but when he was, in his last few years, people sent me mail for him, care of me, if I could transmit it. That did not make him my trustee or whatever. I agree completely. There is also- It also didn't make me the owner of his stuff. Exactly. It just meant I was the address. I was just something to be used. I think that is an apt point. So what the record shows is that Mr. Molechek had a reason for wanting to indicate which of the three accounts were which for his own purposes, but it does not show the necessary express agreement to take on themselves the job of trustee, the thing that they would have to completely change their entire business model to do. Then turning to the other sort of half of the case about the discovery rule. The discovery rule in this case is cleanly determined by the district court without the need to weigh evidence or weighed into things because of the clarity of the evidence in this case. I mean, what we have in this case is at pages 4513 and 4520 of the record, it's correspondence sent by Mr. Ciavelli himself, who says, I don't have any shares anymore because you transferred them without my approval or knowledge. I don't know how much more clearly you can state knowledge of the claim against the brokerage. Now, he says, there were all of these other questions that I had about Mr. Molechek's intentions, and I went to talk to Mr. Molechek about his intentions, and I went to talk to Mr. Dossey about Mr. Molechek's intentions. None of that has anything to do with the duty he's alleging against the brokerage. His own complaint against the brokerage says that your wrongful act was transferring the shares out of this alleged protected account so that it was no longer protected by you. It was outside of your loving embrace, if you will. Worse than that, that it was a conspiracy to steal the funds. Yes, you're exactly right. What can that possibly be based on other than this initial knowledge, you transferred the shares without my, and I don't have them anymore, without my approval or knowledge? There's additional evidence that he knew that the recipient of the shares was not his company. It was an entity with a different name. That's gilding the lily. All you had to know was the first piece of information. What they've tried to do in their briefs is to say, well, but the problem was we didn't know that we had been permanently deprived of the shares. And again, the concern here, that's an issue that they are fully entitled to bring up with Mr. Molechek in the underlying litigation. If they believe that Mr. Molechek violated some duty that he was obliged to take care of them and hold them, that's fine. But that's not what the claim is against us. The Texas standard for the discovery rule is quite plain, and we've explained it in our brief. If you look, and I think our best case is Exxon versus Emerald Oil and Gas. It's a 2011 Texas Supreme Court case. Knowing about the injury does not mean that you have full knowledge of everything that happened. And this is the key quote. Limitations begins to run. Even if the claimant does not yet know the specific cause of the injury, the party responsible for it, the full extent of it, or the chances of avoiding it. If the discovery rule applies in this case, and we've sort of explained why you may or may not find that that's the case, but it doesn't matter for purposes of summary judgment and an efficient opinion writing process, you can concede that and move right on to the fact that once he knew that he had been deprived of his shares without his consent or knowledge, at the very least, he knew he had a legal injury. He may not have known the full extent of it. He may not have known the chances of avoiding it, as they complain. But the Texas Supreme Court has said that does not allow you to toll limitations. That's why, Judge Haynes, it's why I chafe a little bit, and I know you didn't mean to cause me to chafe or struggle, when you say, well, we can find it based on the record, even with what the judge has said. The judge didn't do anything wrong by no means. I'm not suggesting. And I don't mean to. Assuming arguendum. But it's why, in this case, I think that what Judge Hughes did was absolutely right. He said, show me all of your evidence, and I will go through all of your evidence. Tell me what you've got, because I'm looking at this, and you flatly said, I know I no longer have my shares. What are you going to do about that? Well, they said, I wanted to talk to somebody else. And he said, that doesn't say anything against the brokerage. And furthermore, why on earth would you be discharged by talking to somebody you knew you were having a fight with? That's no evidence that helps you. He's not weighing the evidence. He's going through a proper sorting and application of the summary judgment standard. What can I do with this? I have conclusive evidence here. Is there anything that prevents it from being conclusive? No, there's not. What is your response to the notion of, they didn't ask JP because they don't have a relationship with them, but JP owes them a fiduciary duty? I find it circular logic at best. If you believe that JP Morgan has agreed to open an account in which you are the beneficiary under trust law, why on earth could you not call them and say, I am the beneficiary under trust law. Tell me what's going on with this account. It's inconsistent. He didn't even try, as the judge noted. At the very least, you have to pick up the phone and call them and say, I have this belief that you were holding shares in trust for me, even though that's not anything that you ever do as a brokerage firm. What happened here? So that at that point, the brokerage can say, I'm sorry. What? This is news to us. I'm shocked at this allegation. Or what have you, however they're going to respond. They never made that contact, so I think they can't have it both ways. If they're alleging that the fault was the failure to create this account as it should have been, they can't do that, because we don't owe any duty to a third party to not open an account for a stranger. If they're claiming that the problem was you transferred the shares out and I couldn't have ever known what happened, he did know. We know that. We're measuring everything from the date in which he unequivocally stated that he knew. And furthermore, all he had to do was to pick up the phone and call. And that's not inconsistent with the duty that he's alleging in the other evidence. Well, and shouldn't it have gotten his attention that it was a different aster that was? Yes. As the district court noted, you would expect a businessman to know the name of his own company. Earlier, I called that gilding the lily, because there is so much evidence in this case that shows that he had knowledge. But you're right, it's exactly true. In the same year, he unequivocally received notice that the shares were being held at the Bank of Singapore for an entity that was not named his company. So that puts him on notice. I mean, I think that's, again, that's not a fact finding. That's a question of what puts you on notice that your clock starts running. That's exactly right. And there is no dispute about that communication. That communication was in writing. It is undisputedly, shows Ciavelli's knowledge, because he was party to the communication. I think I have said what I came here to say to you. Before it has any further questions. For purposes of rebuttal, why don't you cover why you're entitled to fees? Yes, Your Honor. Under the Texas Theft Liability Act, it's a notorious statute in Texas, because it has a fee-shifting provision, and most court claims don't. But it has a provision saying in any suit under this chapter, the prevailing party gets its fees. In 2016, the only case to have ever addressed this question directly, the Dallas Court of Appeals, said a suit under this chapter includes an allegation of conspiracy to violate the TTLA. Because when you plead conspiracy to violate the TTLA, you have taken on yourself the duty of proving a violation of the TTLA. And so we believe that that is a suit under this chapter for purposes of the statute. That is the only Texas case on point. It's a published case. It explains its reasoning. We think it's very persuasive. They prefer a case that's an unpublished district court case, that didn't address Brinson's reading or its reasoning, that didn't address what the statute says. It sort of treated it as a matter of, well, I just don't think that that's appropriate. And under the facts of the case, it was a different situation. They hadn't proved the case in the first place. So I think that explains why the Traxxas case is what it was, 2019, why it didn't essentially address the question fully. I think that Brinson's reasoning is sound. It's based in the statute. And when this court makes its eerie guess, as I suppose it will have to on the fees, it's a solid, eerie guess to say that a Texas case that is published, that follows the statute, is a reasonable guide for this court. And so we will affirm it. All right. Thank you, Mr. Duff. Mr. Schwartz, you've saved time for a vote. Thank you, Your Honor. So you've said it's a theft. So why is it not under the Texas Theft Liability Act? I couldn't hear you. You have said it's a theft. So why is it not under the Texas Theft Liability Act for purposes of attorney's fees? Because the conspiracy claim is a derivative claim. And a derivative claim is not a claim under the act. It's actually a claim alongside of or connected to it. And the authority for that, Your Honor, that after the Brinson case came out that was just discussed, the Texas Supreme Court decided a case called AGR, A-G-A-R. And I have the slide here. Let's see. 580 Southwest 3rd at 136. And that case dealt with when does a cause of action for conspiracy accrue. And it held that it accrues when the underlying tort accrues. And in discussing conspiracy said, derivative means alongside of or connected to. The plain language of the statute is that you have to make a claim under. But your complaint, it references the prior, I think it was the sixth claim, and it references the fifth and adopts it by reference. So you're adopting by reference the allegations under the TTLA against the conspirators. Why isn't that under? The AGR case also repeatedly referred to direct claims. And so the problem is for JP Morgan, there was no direct claim against JP Morgan under the Texas Theft Liability Act. They were part of a conspiracy, and the conspiracy attempts to hold people liable who may not be liable for the underlying tort, but who have done some act in furtherance of that conspiracy. And that's what JP Morgan, they did a number of things, but that's what they did wrong, is that they didn't do their know your customer, they didn't look into Astor Capital, they allowed the transfer out of the account to an account in Singapore. And they should not have done that. That was the wrong. I do want to address, if I could, this a couple of points quickly. In the Regency versus Swift case, the court defined when a cause of action accrues. And it says a claim accrues when the defendant's wrongful conduct causes the claimant to suffer a legal injury, which gives the claimant the right to seek a judicial remedy. And so what we said is that Mr. Ciavelli didn't have a right to seek a legal remedy against JP Morgan when his shares, to the best of his knowledge, were still being held for his benefit just in another account. And again, context is important. Mr. Ciavelli gave an affidavit, or declaration, in which he said that the shares were in Singapore didn't matter to me because I do business in Singapore, Mr. Molasek does business in Singapore, we both have accounts there. So the actual financial institution wasn't the issue. It was whether they are being held for me or not. And he was told that they were. I also want to address this whole issue with respect to special accounts and trust relationships imposed by law. The argument you heard was that the law requires an express agreement. With respect to special accounts, that agreement can be written, oral, or implied. And the Citizen National Bank case that you were referred to talks about whether an agreement is implied or not. But that's not the only way. And Judge Hughes recognized that a trust relationship could be imposed by virtue of knowledge that the funds or whatever assets are being held are being held for somebody else. No agreement is necessary. It's just the knowledge. So the knowledge that funds are being held that are community property and should be distributed to a child was enough to impose a trust relationship on the bank. The agreement was not specifically required. I said I'd mention this, too. I didn't come back to it. May I just, I want to clarify something, because your reference to the Agar case, I wasn't, I don't recall seeing that. And I just quickly looked through the briefs and I don't see it cited. Is this a new case? It's a case that we found in preparing for the argument. It came out after Brinson. It does relate to the same issue that we've been discussing, which is when a conspiracy is a derivative claim. And so what does that mean? But it's not a new case. No. 580 Southwest Third. But it's cited. You're citing it today for the first time to us? I am, yes, Your Honor. Because I think it's instructive. It's pretty important to your case. Why don't you give a copy of that citation to the bailiff so we'll have it? I'll do that, Your Honor. You were going to make one more point, and I'll give you 30 seconds to do that because you were interrupted by a question. The other point I wanted to make is that, and Judge Hughes recognized this in his opinion, but he discounted it. There was an employee at JP Morgan by the name of Lori Benshot. And Ms. Benshot handled the accounts relating to Astor for Dale Dawsey and for Mr. Molise. And Mr. Dawsey had an account, Dale Dawsey, CO Astor Capital. And Ms. Benshot was fired because she didn't do what she was supposed to do with respect to that account by opening it as a trust account and by identifying the beneficiary, Astor Capital SA. So the words had meaning. The care of Astor had meaning enough to fund it. OK, you've gotten your point in there. Thank you, Mr. Schwartz. Thank you very much. Your case and all of today's cases are under submission, and the court is in recess until 9 o'clock tomorrow.